David W. Hall (SBN 274921)
dhall@hedinhall.com
Frank S. Hedin (SBN 291289)
fhedin@hedinhall.com
HEDIN HALL LLP
Four Embarcadero Center, Suite 1400
San Francisco, CA 94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058

Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
AHDOOT & WOLFSON, PC
10728 Lindbrook Dr. Los Angeles, CA 90024
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*Counsel for Plaintiff and the Putative Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KAREN C. ALEXANDER, individually and on behalf of all others similarly situated,

Plaintiff,

v.

BANK OF AMERICA, N.A.; and BANK OF AMERICA CORPORATION,

Defendants.

Case No. _____

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Karen C. Alexander, individually and on behalf of all others similarly situated, alleges as follows based on personal knowledge as to herself, on the investigation of her counsel, and on information and belief as to all other matters:

## NATURE OF ACTION

1. Plaintiff brings this Class Action Complaint against Bank of America, N.A. and Bank of America Corporation, and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other entities (collectively, "Bank of America" or "Defendant"), for legal and equitable remedies resulting from Bank of America's

illegal assessment of overdraft fees in connection with "one-time," "non-recurring" debit card transactions authorized into a negative account balance, including such transactions to Lyft Inc. ("Lyft") and many other popular merchants.

2.      At all times between May 12, 2014 and April 6, 2017, Bank of America promised its account holders that it "do[es] not authorize overdrafts for everyday *non-recurring* debit card transactions and ATM transactions" and "do[es] *not charge you an Overdraft Item fee* on an everyday *non-recurring* debit card transaction."  However, with respect to *recurring* debit card transactions, Bank of America promised its account holders during that period of time that it would authorize overdrafts and would charge a corresponding overdraft fee: "We do charge you an Overdraft Item fee each time we authorize and pay any other type of overdraft transaction [besides non-recurring transactions].  These other types of transactions include checks and other transactions made using your checking account number, *recurring debit card transactions*, Online and automatic bill payments, and ACH transactions."

3.      At all times from May 12, 2014 through April 6, 2017, Bank of America's contractual documents with account holders drew the following distinction between "non-recurring" debit card transactions (which would not be subject to overdraft fees) and "recurring" debit card transactions (which would be subject to overdraft fees):

> Everyday non-recurring debit card transactions are usually purchases made with your debit card or debit card number on a one-time or day-to-day basis. As examples, you use your debit card for purchases of groceries, gas, or coffee in the morning. Recurring debit card transactions are usually transactions that you set up to occur automatically, such as automatic bill payments. As examples, you give merchants your debit card number to use for rent, mortgage, car, or utility payments.

4.      Despite Bank of America's contractual promises to its account holders that it "do[es] not authorize overdrafts for everyday non-recurring debit card transactions and ATM transactions" and "do[es] not charge you an Overdraft Item fee on an everyday non-recurring debit card transaction," Bank of America systematically authorized numerous

types of non-recurring debit card transactions into a negative balance and charged a $35.00 overdraft fee for each such transaction between May 12, 2014 and April 6, 2017. Bank of America did this by misclassifying certain obviously non-recurring debit card transactions as "recurring" transactions, or by failing to re-classify such misclassified transactions as "non-recurring" transactions – including with respect to Lyft transactions, which between May 12, 2014 and April 6, 2017 were transactions plainly "made with [a] debit card or debit card number on a one-time or day-today basis," and not "set up to occur automatically."

5.     Bank of America authorized these misclassified transactions in order to maximize its overdraft fee revenue, at the expense of its own account holders, many of whom are among the most vulnerable members of society.

6.     For people living paycheck to paycheck, like Plaintiff and other members of the Class, Bank of America's oppressive overdraft fee practices have caused them damages and had a serious effect on their everyday lives.

7.     The business practices of Bank of America described herein were not only oppressive – they were also illegal. It's nigh time for Bank of America to return, with interest, the millions upon millions of dollars it has illegally siphoned from its customers' accounts, $35.00 overdraft fee at a time, and to face additional consequences, both remedial and punitive, for having engaged in these wrongful acts in the first place.

8.     Plaintiff seeks monetary damages from Bank of America – including actual, compensatory, consequential, and punitive damages, to the fullest extent permitted by law – on behalf of herself and the other members of the Class.

<u>JURISDICTION AND VENUE</u>

9.     The Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) & (6), because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and because at least one of the members of the proposed Class is a citizen of a different state than Bank of America.

10.     Personal jurisdiction and venue are proper in this District pursuant to the "Deposit Agreement and Disclosures" entered into between Plaintiff and Bank of America because Plaintiff's account was opened, and is presently maintained, at a Bank of America financial center located in California.  *See* "Deposit Agreement and Disclosures," dated March 4, 2016, attached hereto as Exhibit "A" (hereinafter the "Deposit Agreement"), at 48 ("Any action or proceeding regarding your account or this deposit agreement must be brought in the state in which the financial center that maintains your account is located. You submit to the personal jurisdiction of that state.").

<u>PARTIES</u>

11.     Plaintiff is a resident and citizen of Vallejo, California.  At all times mentioned herein, Plaintiff has maintained a personal checking account with Bank of America that was opened at a Bank of America branch in California.

12.     Bank of America is a national bank with its headquarters and principal place of business in Charlotte, North Carolina.  Bank of America provides, *inter alia*, retail banking services to consumers, including personal checking accounts and debit cards to Plaintiff and the members of the putative Class.  Bank of America operates banking centers throughout California and the United States.

<u>FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS</u>

I.      OVERDRAFT FEES ARE LUCRATIVE FOR BANK OF AMERICA, BUT DEVASTATING FOR ITS POOREST AND MOST VULNERABLE CUSTOMERS

13.     Fee-based overdraft programs cost American consumers at least $23.7 billion each year in the aggregate – more than the loans extended in exchange for those fees, which amount to $21.3 billion.[1]  Debit card transactions, the most common triggers of overdraft fees, cause an average overdraft of approximately $17.00 yet trigger an average

---

[1]     Leslie Parrish, *Overdraft Explosion: Bank fees for overdrafts increase 35% in two years,*  Center for Responsible Lending, Oct. 6, 2009, *available at* http://www.responsiblelending.org/overdraftloans/research-analysis/crl-overdraft-explosion.pdf.

- 4 -

fee of approximately $35.00.[2]  Most consumers do not learn of an overdraft for two or more days, further exposing them to additional overdraft fees in the interim.[3]

14.     The overwhelming majority of overdraft fees are paid by chronic overdrafters who are also those least able to recover from them.  According to research by the Consumer Financial Protection Bureau, less than one-fifth of account holders — those who incur three or more overdraft fees per year — pay more than 90 percent of all overdraft fees triggered by debit cards, checks, and ACH electronic transactions.[4]  And a study conducted by Pew Charitable Trusts found that "heavy overdrafters" — consumers who pay more than $100 in overdraft fees in a year — generally have incomes below the U.S. average, and overdraft fees consumed nearly a full week's worth of their household incomes on average during the past year.[5]  Seniors, young adults, military families, and the unemployed are hit particularly hard.[6]  Older Americans aged 55 and over pay over $6.2 billion in total overdraft

---

[2]     Eric Halperin, Lisa James, and Peter Smith, *Debit Card Danger: Banks offer little warning and few choices as customers pay a high price for debit card overdrafts*, Center for Responsible Lending, at 25, Jan. 25, 2007, *available at* http://www.responsiblelending.org/overdraft-loans/research-analysis/Debit-Card-Danger-report.pdf.

[3]     The Pew Charitable Trusts, *Overdrawn: Persistent Confusion and Concern About Bank Overdraft Practices*, June 2014, at 9-10, *available at* http://www.pewtrusts.org/~/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf.

[4]     Consumer Financial Protection Bureau, *Data Point: Checking Account Overdraft*, at 18, July 2014, *available at* http://files.consumerfinance. gov/f/201407_cfpb_report_data-point_overdrafts.pdf.

[5]     The Pew Charitable Trusts, *Heavy Overdrafters: A Financial Profile*, at 1, Apr. 2016, *available at* http://www.pewtrusts.org/~/media/assets/2016/04/heavyoverdrafters.pdf.

[6]     *See* FDIC Study of Bank Overdraft Programs (Nov. 2008), at v.; Leslie Parrish,  *Consumers Want Informed Choice on Overdraft Fees and Banking Options, CRL Research Brief*, Apr. 16, 2008,  *available at* http://www.responsiblelending.org/overdraft-loans/research-analysis/final-caravan-survey-4-16-08.pdf;  *see also* Comments of the Center for Responsible Lending to Board of Governors of the Federal Reserve System on Proposed Rule to Amend Regulation E—Overdraft Practices, Part II.B.1(b), pp. 10-12, Mar. 30, 2009,  *available at*  http://www.responsiblelending.org/overdraft-loans/policylegislation/regulators/comments-regulation-e_overdraft-practices.pdf.

fees annually[7] — $2.5 billion for debit card/ATM transactions alone[8] — and those heavily dependent on Social Security pay $1.4 billion annually.[9]

15.     As the financial toll of fee-based overdraft programs has increasingly and disproportionately fallen on the shoulders of our most vulnerable citizens, big banks have steadily become more and more reliant on overdraft fees as a revenue source.  For instance, in 2015, banks in the United States with assets exceeding $1 billion reported $11.16 billion in overdraft fee revenue – which constituted nearly two-thirds of all consumer deposit account revenue for those banks.

16.     For Bank of America in particular, overdraft has evolved from an occasional courtesy into a product that it depends upon for revenue.  Indeed, in 2016, Bank of America made more than $1.7 billion on overdraft fees, siphoned $35.00 fee at a time largely out of accounts held by its poorest customers, as discussed above. On average, each Bank of America checking account holder is charged $497.18 in overdraft fees each year.[10]

17.     Faced with heightened regulatory scrutiny in recent years, but still having an insatiable appetite for overdraft fee revenue to feed, Bank of America has been forced to develop creative new strategies, legal or not, to lure its account holders into overdraft.[11] This case concerns one such strategy, executed by Bank of America in plain violation of

---

[7]     Leslie Parrish and Peter Smith, *Shredded Security: Overdraft practices drain fees from older Americans*, Center for Responsible Lending, June 18, 2008, *available at* http://www.responsiblelending.org/overdraftloans/research-analysis/shredded-security.pdf.

[8]     *Id.*

[9]     *Id.* At 6, Table 1.

[10]     Byrne, John, *Bank Fees rise to all-time high – and nobody can stop them*, New York Post, Mar. 12, 2017, *available at* https://nypost.com/2017/03/12/bank-fees-rise-to-all-time-high-and-nobody-can-stop-them/.

[11]     *See, e.g., Farrell v. Bank of America, N.A.*, Case No. 3:16-cv-00492-L-WVG (S.D. Cal.) ($66.6 million settlement for improper extended overdraft fees); *Bodnar v. Bank of America, N.A.*, Case No. 5:14-cv-3224-EGS (E.D. Pa.) ($27.5 million settlement for improper overdraft fees charged despite sufficient available funds); *Pantelyat v. Bank of America, N.A.*, Case No. 1:16-cv-8964-AJN (S.D.N.Y.) ($22 million settlement for improper overdraft fees charged on non-recurring Uber transactions).

the express terms of its standardized Deposit Agreement with all personal checking account holders.

## II.   BANK OF AMERICA PROMISES NOT TO CHARGE OVERDRAFT FEES FOR NON-RECURRING DEBIT TRANSACTIONS, BUT THEN DOES SO ANYWAY

18.   Bank of America's relationship with Plaintiff and the other members of the Class was at all times mentioned herein governed by the Deposit Agreement – a standardized contract for deposit accounts, the terms of which are drafted by Bank of America, amended by Bank of America from time to time at its convenience and sole and complete discretion, and imposed by Bank of America on all of its customers.  *See* Ex. A.

19.   For the better part of the past two decades, Bank of America has issued debit cards to its personal checking account customers, including to Plaintiff and the members of the Class, which can be used to make purchases, payments, withdrawals and, of particular relevance to this case, both "recurring" and "non-recurring" debit transactions.

20.   At all times mentioned herein, including between May 12, 2014 and April 6, 2017, the Deposit Agreement defined a "recurring" debit card transaction as one that occurs at a regular interval, like a payment for a mortgage, utility bill, insurance premium, or membership fee, and defined a "non-recurring" debit card transaction as one that occurs on a one-time or day-to-day basis, like a purchase at a gas station.

### A.   In 2010, Bank of America For the First Time Distinguishes Between "Non-Recurring" and "Recurring" Debit Card Transactions for Overdraft Fee Purposes, And Uses the Distinction to Tout Itself As a Consumer Advocate

21.   In 2010, Bank of America suddenly began promising its account holders that it would not authorize (and would thus cease charging $35.00 overdraft fees resulting from) "one-time," "non-recurring" debit card transactions for which there are insufficient funds to cover, but would continue to authorize (and thus continue charging $35.00 overdraft fees resulting from) "recurring" debit card transactions for which there are insufficient funds to cover.  In other words, Bank of America for the first time adopted a radical distinction, which had significant implications on the Bank's overdraft fee policies, between the two types of debit card transactions: (1) one-time debit card transactions (which it promised

would be absolutely protected from overdraft fees); and (2) recurring debit card transactions (which it said could be subjected to overdraft fees).

22.     Bank of America then seized upon the distinction it had drawn between one-time, non-recurring debit card transactions and recurring debit card transactions to publically tout, through a massive media effort, its supposedly pro-consumer decision not to charge overdraft fees on routine debit card transactions.  For example, Susan Faulkner, an executive at Bank of America, was quoted in a CNN article from 2010 as saying: "Our customers have been clear that <u>they want to know if a purchase is going to overdraw their account</u>."[12]  Around the same time, a New York Times article stated:  "In a move that could bring an end to the $40 cup of coffee, Bank of America said on Tuesday that it was doing away with overdraft fees on purchases made with debit cards[.]  Bank [of America] officials said that effective this summer, <u>customers who try to make purchases with their debit cards without enough money in their checking accounts will simply be declined</u>."[13]  Faulkner was quoted in the New York Times piece as well: "What our customers kept telling me is '<u>just don't let me spend money that I don't have</u>'. . . .  <u>We wanted to help them avoid those unexpected overdraft fees</u>."[14]

23.     Accordingly, as both Ms. Faulkner surely understood and Bank of America clearly intended, this new distinction in debit card transactions caused consumers to rely upon the overdraft fee policy implicated by the distinction and to therefore expect that, when they attempt to use their debit card for a routine non-recurring purchase in the future, the transaction will only be approved if sufficient funds exist to cover the purchase, and in no event will the transaction result in an overdraft fee.

---

[12]     Hibah Yousuf, *BofA to scrap overdraft fees on debit purchases*, CNN Money, Mar. 10 , 2010, *available at http://money.cnn.com/2010/03/10/news/companies/Bank_of_America_overdraft_fees/* (emphasis added).

[13]     Andrew Martin, *Bank of America to End Debit Card Overdraft Fees*, The New York Times, Mar. 9, 2010, *available at* http://www.nytimes.com/2010/03/10/your-money/credit-and-debit-cards/10overdraft.html (emphasis added).

[14]     *Id.* (emphasis added).

24.     After repeatedly making these promises to the American public in 2010, in The New York Times and elsewhere, Bank of America took pen to paper and memorialized these significant, material promises in its standardized Deposit Agreement with its personal checking account holders, including Plaintiff and the other members of the Class.

### B. Bank of America Amends the Deposit Agreement to Provide Absolute Immunity from Overdraft Fees for Non-Recurring Debit Card Transactions

25.     Later in 2010, consistent with its public statements in The New York Times and elsewhere, Bank of America amended its Deposit Agreement and other documents governing its relationship with Plaintiff and the other unnamed Class members to expressly state that Bank of America will not under any circumstances authorize overdrafts, or charge overdraft fees for, one-time, "non-recurring" debit card transactions, as that term was defined in the Deposit Agreement.

26.     Specifically, in June 2010, Bank of America issued a new Deposit Agreement (the pertinent terms of which remained in effect without amendment or alteration until April 7, 2017), which stated in relevant part:

> OVERDRAFT AND DECLINED OR RETURNED ITEMS
> When we determine that you do not have enough available funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item. If you have enrolled in one of the optional Overdraft Protection plans and have enough available funds in the linked account under the Overdraft Protection plan, we transfer funds to cover the item. Otherwise, without notice to you, we either authorize or pay the insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item). . . .
>
> PERSONAL ACCOUNTS - OVERDRAFT PRACTICES AND SETTINGS
>
> With our Standard Overdraft Setting, we do not authorize overdrafts for everyday non-recurring debit card transactions and ATM transactions. This means that we decline everyday non-recurring debit card transactions and ATM transactions when we determine that at the time of the transaction you may not have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction . . . . With this overdraft setting, we may authorize and pay overdrafts for other types of transactions. Other types of transactions include checks and other transactions made using

your checking account number, recurring debit card transactions, ACH transactions, preauthorized payments, and automatic and online bill payments.

Ex. A at 11-13, 21-22 (emphasis added).

27.    The Deposit Agreement explained the distinction between "non-recurring" and "recurring" debit card transactions as follows:

> *What are everyday non-recurring debit card transactions and what are recurring debit card transactions?* Everyday non-recurring debit card transactions are usually purchases made with your debit card or debit card number on a one-time or day-today basis. As examples, you use your debit card for purchases of groceries, gas, or coffee in the morning. Recurring debit card transactions are usually transactions that you set up to occur automatically, such as automatic bill payments. As examples, you give merchants your debit card number to use for rent, mortgage, car, or utility payments.

*Id.* at 12.

28.    The Deposit Agreement expressly incorporated by reference a document entitled "Schedule of Fees," a copy of which is attached hereto as Exhibit "B". The Schedule of Fees stated, in pertinent part:

> We do not charge you an Overdraft Item fee on an everyday non-recurring debit card transaction. We also do not charge you an Overdraft Item fee on a ATM transaction unless you agreed to our overdraft practices for that particular ATM transaction. We do charge you an Overdraft Item fee each time we authorize and pay any other type of overdraft transaction. These other types of transactions include checks and other transactions made using your checking account number, recurring debit card transactions, Online and automatic bill payments, and ACH transactions.

*See* Ex. B, at 13 (emphasis added).

29.    In July 2014, Bank of America drafted and imposed on account holders a document entitled "Important Information about Your Card Agreement and Disclosure," attached hereto as Exhibit "C", which stated in pertinent part:

> Overdrafts and Unposted Transactions
> When you do not have enough available funds in your account ... to cover everyday non-recurring debit card purchases or ATM withdrawals, we will decline the transaction and you will not be subject to overdraft fees. For checks, ACH, recurring debit card transactions and online bill payments, we may decline or return the transaction unpaid or we may complete it and overdraw your account.

- 10 -

*See* Ex. C, ¶¶ 4b, 7 (emphasis added).

30. Thus, by the express terms of the Deposit Agreement (and related documents) in effect at all times between May 12, 2014 and April 6, 2017, Bank of America promised its personal checking account holders, including Plaintiff and the other members of the Class, that it would only charge overdraft fees as a result of recurring debit card transactions authorized into a negative balance, and would never authorize non-recurring debit card transactions into a negative balance much less charge overdraft fees for such transactions.

31. During this same period of time, May 12, 2014 through April 6, 2017, Bank of America's website reiterated its overdraft fee policies pertaining to recurring and non-recurring transactions as follows:

> ATM withdrawals and everyday, non-recurring debit card transactions (individual debit card purchases such as at the grocery store or a one-time online purchase), will only be authorized when we determine you have enough available funds in your eligible account or in your eligible linked Overdraft Protection account at the time of the transaction. Otherwise, we typically decline the transaction and we do not charge an Overdraft Item fee.
>
> For other types of transactions, such as checks, Bill Pay and other electronic payments, as well as recurring debit card payments we may pay transactions when you don't have enough available funds in your checking account or linked Overdraft Protection account at the time of the transaction.

*See* Glossary of Banking Terms, Definition of "Standard Setting" (also available at *https://www.bankofamerica.com/deposits/manage/glossary.go* (last visited Nov. 14, 2016)), a copy of which is attached hereto as Exhibit "D".

32. Likewise, the "FAQs" section of the Bank of America webpage pertaining to "overdraft services," also in effect at all times between May 12, 2014 and April 6, 2017, stated in pertinent part:

> When you use your debit card for everyday, non-recurring purchases, when we determine you don't have enough funds in your account or linked Overdraft Protection account our standard practice is to decline the transaction, and we do not charge an overdraft fee.

> For other types of transactions – like checks, Bill Pay and other electronic payments, as well as recurring debit card payments – made using your checking account number, we may charge you a NSF: Returned Item fee each time we decline or return one of these transactions. If we pay one of these transactions, we charge you an Overdraft Item fee.

*See* "FAQs: With Bank of America's Overdraft Settings, will I still be subject to Overdraft and NSF: Returned Item fees?," at 4, a copy of which is attached hereto as Exhibit "E", *also available at https://www.bankofamerica.com/deposits/manage/faq-overdraft-services.go* (last visited Nov. 14, 2016).

33.     Another FAQ section of Bank of America's website stated, likewise in reference to the contractual promises in the Deposit Agreement in effect between May 12, 2014 and April 6, 2017, that "[w]e do not charge you an Overdraft item fee on an everyday non-recurring debit transaction."   *See* "FAQs: Bank Account Rates and Fees, What is an Overdraft Item fee?," at 1, a copy of which is attached hereto as Exhibit "F", *also available at https://www.bankofamerica.com/deposits/manage/faq-account-rates-fees.go* (last visited Nov. 14, 2016).

34.     And on the "Checking Clarity Statement" page of its website, described as providing "checking fee and policy information in a simple format so you know the ins and outs of your account," Bank of America provided its account holders a document entitled "Overview of Bank of America Core Checking key policies and fees", which, with respect to the Deposit Agreement in effect between May 12, 2014 and April 6, 2017, stated in pertinent part: "To help you avoid fees, we won't authorize ATM withdrawals or everyday debit card purchases when you don't have enough money in your account at the time of the transaction." *See* "Checking Clarity Statement (landing page)," a copy of which is attached hereto as Exhibit "G", *also available at https://www.bankofamerica.com/deposits/checking/checking-clarity-statement.go* (last visited Nov. 14, 2016); *see also* "Overview of Bank of America Core Checking key policies and fees," Aug. 2016, a copy of which is attached hereto as Exhibit "H".

35. The foregoing contractual promises made by Bank of America in its Deposit Agreement and other account-related documents – all of which remained in effect without material change for the next seven years, including at all times between May 12, 2014 and April 6, 2017 – were repeatedly broken by Bank of America over that same period of time, damaging Plaintiff and the other members of the Class, as discussed below in detail.

### C. In Breach of Its Deposit Agreement with Account Holders, Including Plaintiff and the Class, Bank of America Charges Overdraft Fees On Non-Recurring Debit Card Transactions Authorized Into a Negative Balance

36. The debit card transaction processing and overdraft fee assessment practices employed by Bank of America from May 12, 2014 through April 6, 2017 were completely contrary to the plain language of the governing Deposit Agreement and other account-related documents in effect during that period of time, in two primary ways.

37. <u>First</u>, between May 12, 2014 and April 6, 2017, Bank of America misclassified, or intentionally failed to properly reclassify, many one-time, "non-recurring" debit card transactions as "recurring" debit card transactions. For example, Bank of America debit card charges from Lyft, among several other merchants, including Uber, were misclassified during this period of time as "recurring," even though they were plainly "non-recurring" within the meaning of the Deposit Agreement and related documents in effect between May 12, 2014 and April 6, 2017. Indeed, during that period of time, charges from merchants such as Lyft and Uber, among many others, did not and indeed could not be set to occur automatically at a designated interval, such as on a weekly or monthly basis. Rather, at that time, Lyft and Uber charges occurred on a ride-by-ride basis only, and thus plainly constituted one-time every day transactions, falling squarely within Bank of America's own definition of "non-recurring" debit card transactions, which Bank of America promised would be absolutely exempt from overdraft fees.

38. <u>Second</u>, between May 12, 2014 and April 6, 2017, Bank of America systematically authorized into a negative balance and charged $35.00 overdraft fees for

these misclassified non-recurring debit card transactions.[15]  And if a deposit was not made to bring the negative balance back into the black within seven days, Bank of America charged another $35.00 "extended overdrawn balance charge" for the misclassified transaction.   Bank of America assessed these fees despite its repeated contractual representations to all account holders between May 12, 2014 and April 6, 2017 that (1) it will only authorize, and will only charge overdraft fees for, recurring debit card transactions for which there are insufficient available funds to cover; and (2) that it will not authorize, and will not charge overdraft fees for, non-recurring debit card transactions for which there are insufficient funds to cover.

39.     The practices alleged above were not only contrary to Bank of America's contractual obligations to its account holders, they also flew directly in the face of its so-called "consumer friendly" overdraft fee policies, which were supposedly designed "to help [customers] avoid . . . unexpected overdraft fees" by "[not] let[ting] [them] spend money that [they] don't have."  In reality, the classification of Lyft and innumerable other obviously one-time debit card transactions as "recurring" was specifically designed to let consumers blow money they didn't have and to incur costly fees as a result.

40.     To recap, after having affirmatively told its customers that they no longer needed to worry about spending money they didn't have in the course of making non-recurring, one-time, day-to-day purchases, and after having memorialized those promises in the governing Deposit Agreement in effect between May 12, 2014 and April 6, 2017, Bank of America purposefully broke those promises and took advantage of the very trust it had instilled in its customers by authorizing various types of one-time non-recurring debit card transactions (from some of the most popular merchants, including Lyft) into negative account balances, for the sole purpose of maximizing its overdraft fee revenue.

---

[15]     Egregiously, most of these misclassified charges are of nominal dollar amounts (most Lyft charges are under $10.00), significantly less than the $35.00 fee imposed by Bank of America.

**III. BANK OF AMERICA REPEATEDLY CHARGES PLAINTIFF OVERDRAFT FEES FOR NON-RECURRING DEBIT CARD PURCHASES, INCLUDING FOR LYFT RIDES AND NUMEROUS OTHER ONE-TIME TRANSACTIONS**

41.     On numerous occassions between May 12, 2014 and April 6, 2017, Bank of America authorized a "non-recurring" debit card transaction, as that term was defined in the Deposit Agreement and related account documents in effect between May 12, 2014 and April 6, 2017, into a negative balance in Plaintiff's personal checking account, and as a result charged a $35.00 overdraft fee to Plaintiff's personal checking account for the transaction.

42.     For example, on September 25, 2014, Plaintiff used her Bank of America debit card to make three one-time purchases from Lyft, the ridesharing company, each in an amount of less than $25.00.  Each of these three purchases constituted a "non-recurring" debit card transaction (within the meaning of the Deposit Agreement and related documents in effect between May 12, 2014 and April 6, 2017), because all Lyft purchases made by Plaintiff occurred on a one-time, day-to-day basis, and because such purchases were not, and indeed could not be, set up to occur automatically at a set interval between May 12, 2014 and April 6, 2017.

43.     When Plaintiff used her debit card to purchase each of the three Lyft rides on September 25, 2014, as well as at various other occassions between May 12, 2014 and April 6, 2017 when Plaintiff initiated one-time, non-recurring Lyft debit card transactions that Bank of America authorized into a negative balance, Plaintiff reasonably believed, based upon the Deposit Agreement and related documents in effect at those times, as well as other statements publicly made by Bank of America interpreting those documents, that Lyft debit card purchases constituted non-recurring debit card transactions, that Bank of America would thus only authorize such a purchase if she had sufficient funds in her checking account to cover it, and that under no circumstances would Bank of America charge her an overdraft fee resulting from such a purchase.

44.     Nevertheless, Bank of America misclassified each of the three non-recurring Lyft debit card transactions that Plaintiff initiated on September 25, 2014 as a "recurring" debit card transaction.  And then, despite the fact that Plaintiff's checking account did not

have sufficient funds to cover any of the three one-time, non-recurring Lyft transactions on September 25, 2014, Bank of America authorized the charges anyway – each one bringing her account balance further into the negative.  As a result, later that same day, Bank of America charged three $35.00 overdraft fees to Plaintiff's checking account, one for each of the three misclassified Lyft transactions improperly authorized into a negative account balance by Bank of America.

45.	On several other occasions between May 12, 2014 and April 6, 2017, Plaintiff's personal checking account has been charged $35.00 overdraft fees as a result of various transactions, including from Lyft and many other merchants, that were also "non-recurring" in nature (within the meaning of the Deposit Agreement and related documents in effect between May 12, 2014 and April 6, 2017) but were nonetheless authorized by Bank of America into a negative account balance.

46.	The Deposit Agreement and other related account documents in effect between May 12, 2014 and April 6, 2017 expressly prohibited the authorization of, let alone the imposition of any overdraft fees related to, the non-recurring Lyft transactions made by Plaintiff on September 25, 2014 (or the numerous other Lyft transactions and other one-time debit transactions to other merchants made by Plaintiff during the relevant period of time that were likewise misclassified and resulted in overdraft fees against Plaintiff's account).

47.	No reasonable person would have considered the Lyft charges or any of Plaintiff's other one-time debit card charges that Bank of America authorized into a negative balance to be "recurring" within the meaning of the Deposit Agreement or related documentation in effect between May 12, 2014 and April 6, 2017.

48.	Plaintiff is informed and believes, and thereupon alleges, that Bank of America had actual knowledge, prior to May 12, 2014 and during the period of time between May 12, 2014 and April 6, 2017, that Lyft debit card transactions, as well as numerous other one-time, non-recurring debit card transactions, including Uber debit card transactions, various

types of PayPal debit card transactions, and a long list of other one-time debit card transactions, were being misclassified as "recurring", were frequently authorized into negative account balances, and were thus routinely triggering improper overdraft fees. Plaintiff is informed and believes, and thereupon alleges, that despite having had such actual knowledge, Bank of America intentionally failed between May 12, 2014 and April 6, 2017 to process Lyft and various other one-time debit card transactions as "non-recurring" within the meaning of the Deposit Agreement and related documents in effect between May 12, 2014 and April 6, 2017.

49.     In imposing and collecting overdraft fees as a result of these one-time, non-recurring debit card transactions improperly authorized into a negative account balance between May 12, 2014 and April 6, 2017, Bank of America breached the Deposit Agreement and other account-related documents that governed its relationship with Plaintiff and the other members of the Class, causing them monetary damages.

<u>CLASS ALLEGATIONS</u>

50.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

51.     The proposed Class is defined as:

> All individuals in the United States who, at any time between May 12, 2014 and April 6, 2017, held a personal checking account with Bank of America that was charged an overdraft fee as a result of a non-recurring debit card transaction authorized into a negative account balance.

52.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

53.     Excluded from the Class are Bank of America, its parents, subsidiaries, affiliates, officers and directors, any entity in which Bank of America has a controlling interest, all customers who make a timely election to be excluded, governmental entities,

and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

54. Also excluded from the Class are all non-excluded members of the Settlement Class in the civil action entitled *Pantelyat v. Bank of America, N.A., et al.*, Case No. 16-cv-8964-AJN (S.D.N.Y.) who, between May 12, 2014 and April 6, 2017, incurred no overdraft fees resulting from non-recurring debit card purchases other than from non-recurring debit card purchases from Uber.

55. The members of the Class are so numerous that joinder is impractical. On information and belief, the Class consists of hundreds of thousands, and potentially millions, of members, the identity of whom is within the knowledge of Bank of America and can be ascertained only by resort to Bank of America's records.

56. The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all Class members, was charged overdraft fees by Bank of America between May 12, 2014 and April 6, 2017 as a result of non-recurring debit card transactions that were mis-classified as recurring transactions and authorized into a negative balance. Plaintiff, like all Class members, has been damaged by Bank of America's misconduct in that she was assessed unlawful overdraft charges in breach of the governing Deposit Agreement. Furthermore, the factual basis of Bank of America's misconduct is common to all Class members and represents a common thread of unlawful, unfair, and unconscionable conduct resulting in injury to all members of the Class.

57. There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members. Among the questions of law and fact common to the Class are whether Bank of America:

      a. Misclassified as "recurring" in nature, or failed to properly re-classify as "non-recurring" in nature, as those terms are defined by the relevant Bank of America contractual documents in effect between May 12, 2014 and April 6, 2017, any debit card transactions made between May 12, 2014 and April 6, 2017;

b. Authorized into a negative account balance between May 12, 2014 and April 6, 2017 any debit card transactions that were in fact "non-recurring," within the meaning given to that terms by the relevant Bank of America contractual documents in effect between May 12, 2014 and April 6, 2017;

c. Imposed any overdraft fees between May 12, 2014 and April 6, 2017 on any debit card transactions that were "non-recurring" in nature, within the meaning given to that term by the relevant Bank of America contractual documents in effect between May 12, 2014 and April 6, 2017;

58.     Other questions of law and fact common to the Class include:

a. The proper method or methods by which to measure damages;

b. Whether the Class is entitled to interest that has accrued on any improperly assessed overdraft fees; and

c. The declaratory relief to which the Class are entitled.

59.     Plaintiff's claim are typical of the claims of other Class members in that they arise out of the same overdraft policies governed by Bank of America's Deposit Agreement and other related documents in effect between May 12, 2014 and April 6, 2017, and arise out of the same conduct and practices of Bank of America in classifying transactions and imposing overdraft fees that occurred between May 12, 2014 and April 6, 2017. Plaintiff has no interests antagonistic to the interests of any other Class member.

60.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of consumer class actions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

61.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the enormity of the financial resources of Bank of America, no Class member could afford to seek legal redress

individually for the claims alleged herein. Therefore, absent a class action, the Class members would lose their rights by attrition, and Bank of America's misconduct could continue with impunity..

62.     Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved in this action, individualized litigation would significantly delay and cause expense to all parties and the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

**SOLE CLAIM FOR RELIEF**
**BREACH OF CONTRACT**
**(Individually and On Behalf of the Class)**

63.     Plaintiff repeats and incorporates herein all allegations from paragraphs 1-62 above.

64.     Plaintiff and all members of the Class contracted with Bank of America for bank account deposit, checking, ATM, and debit card services, as embodied in Bank of America's Deposit Agreement and related account documentation in effect between May 12, 2014 and April 6, 2017.

65.     Bank of America breached the terms of the Deposit Agreement and related account documentation in effect between May 12, 2014 and April 6, 2017 by charging overdraft fees to Plaintiff and the other members of the Class as a result of non-recurring debit card transactions authorized into a negative balance between May 12, 2014 and April 6, 2017.

66.     In plain, clear, and simple language, in the Deposit Agreement and related account documentation in effect between May 12, 2014 and April 6, 2017, Bank of America promised Plaintiff and all other members of the Class (1) that it would not authorize, and

would not charge an overdraft fee on, a non-recurring debit card transaction where insufficient funds exist to cover the transaction; and (2) that it would authorize, and would charge an overdraft fee on, a recurring debit card transaction where insufficient funds exist to cover the transaction. *See* Ex. A, at 12-13.

67. Bank of America breached the express terms of the Deposit Agreement and other related account documentation in effect between May 12, 2014 and April 6, 2017 when it authorized into a negative balance, and then assessed overdraft fees on, "non-recurring" debit card transactions initiated between May 12, 2014 and April 6, 2017.

68. Specifically, Bank of America breached its contractual promises to Plaintiff and all members of the Class by mislabeling Lyft and other one-time, "non-recurring" debit card transactions as "recurring" debit card transactions, as those terms are defined in the Deposit Agreement and other related account documentation in effect between May 12, 2014 and April 6, 2017, and by authorizing into negative balances and then imposing $35.00 overdraft fees as a result of such transactions made between May 12, 2014 and April 6, 2017.

69. At all times between May 12, 2014 and April 6, 2017, Lyft charges constituted "recurring" charges within the meaning of the Deposit Agreement and related documentation in effect between May 12, 2014 and April 6, 2017.

70. No reasonable person would, at any time between May 12, 2014 and April 6, 2017, consider Lyft charges to be "recurring" charges within the meaning of the Deposit Agreement and related account documentation in effect between May 12, 2014 and April 6, 2017.

71. Plaintiff and the members of the Class reasonably believed, based upon the Deposit Agreement and related documents in effect between May 12, 2014 and April 6, 2017, as well as other statements made by Bank of America interpreting those documents, that Lyft charges are non-recurring transactions, that Bank of America would only authorize

Lyft purchases if available funds existed to cover the transaction, and that under no circumstances would an overdraft fee be imposed as a result of such a transaction.

72.     At no time between May 12, 2014 and April 6, 2017 did any contractual provision exist authorizing Bank of America to charge overdraft fees on non-recurring debit card transactions such as Lyft transactions that were initiated by Plaintiff or any other Class member between May 12, 2014 and April 6, 2017.

73.     Plaintiff and members of the Class have performed all of the obligations imposed on them under the Deposit Agreement and related documentation in effect between May 12, 2014 and April 6, 2017.

74.     Plaintiff and members of the Class sustained monetary damages between May 12, 2014 and April 6, 2017 as a result of Bank of America's breaches of the Deposit Agreement and related account documentation in effect between May 12, 2014 and April 6, 2017.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Karen C. Alexander, individually and on behalf of the Class, demands a jury trial on all claims so triable and judgment as follows:

A.     Declaring Bank of America's overdraft fee policies and practices described above to be wrongful, unfair, and unconscionable;

B.     Awarding actual damages in an amount according to proof;

C.     Awarding restitution for all overdraft fees collected by Bank of America by Plaintiff and the Class resulting from the wrongs alleged herein in an amount to be determined at trial;

D.     Disgorgement of the ill begotten gains derived by Bank of America from its misconduct;

E.     Awarding punitive and exemplary damages;

F.     Awarding pre-judgment interest at the maximum rate permitted by applicable law;

G.     Awarding costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

H.     Awarding such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff, on behalf of herself and the Class, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all claims so triable.

Dated:  May 12, 2018              Respectfully submitted,

HEDIN HALL LLP

By: s/ David W. Hall
         David W. Hall

David W. Hall (SBN 274921)
dhall@hedinhall.com
Frank S. Hedin (SBN 291289)
fhedin@hedinhall.com
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058

By: s/ Robert Ahdoot
         Robert Ahdoot

Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
AHDOOT & WOLFSON, PC
10728 Lindbrook Dr.
Los Angeles, CA 90024
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*Counsel for Plaintiff and the Putative Class*